**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| KRYSTAL A. TOLAND, | ) | CASE NO. 3:13-CV-00877 |
| | ) | |
| Plaintiff, | ) | JUDGE HELMICK |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | VECCHIARELLI |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner | ) | |
| of Social Security, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Krystal A. Toland ("Plaintiff"), challenges the final decision of Defendant,

Carolyn W. Colvin, Acting Commissioner of Social Security ("Commissioner"), denying

her applications for Period of Disability ("POD"), Disability Insurance Benefits ("DIB"),

and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security

Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("Act"). This case is before the undersigned

United States Magistrate Judge pursuant to an automatic referral under Local Rule

72.2(b) for a Report and Recommendation.  For the reasons set forth below, the

Magistrate Judge recommends that the Commissioner's final decision be REVERSED

and REMANDED for proceedings consistent with this Report and Recommendation.

## I.   PROCEDURAL HISTORY

On December 2, 2009, Plaintiff filed her applications for POD and DIB.

(Transcript ("Tr.") 47.)  On December 11, 2009, she filed her application for SSI.  (*Id.*)

In both applications, Plaintiff alleged a disability onset date of May 30, 2008.  (*Id.*)  The

application was denied initially and upon reconsideration, and Plaintiff requested a

hearing before an administrative law judge ("ALJ").  (*Id.*)  On October 6, 2011, an ALJ held Plaintiff's hearing.  (*Id.*)  Plaintiff participated in the hearing, was represented by counsel, and testified.  (*Id.*)  A vocational expert ("VE") also participated and testified.  (*Id.*)  On November 4, 2011, the ALJ found Plaintiff not disabled.  (Tr. 44.)  On February 22, 2013, the Appeals Council declined to review the ALJ's decision, and the ALJ's decision became the Commissioner's final decision.  (Tr. 1.)  On April 18, 2013, Plaintiff filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)  The parties have completed briefing in this case.  (Doc. Nos. 19, 20, 21.)

Plaintiff asserts the following assignments of error: (1) The ALJ erred in basing his RFC determination on an unsupported conclusion contradictory to the evidence of record; and (2) the ALJ erred in evaluating the opinion of Plaintiff's treating physician.

## II.   EVIDENCE

### A.   Personal and Vocational Evidence

Plaintiff was born in May 1985 and was 22-years-old on the alleged disability onset date.  (Tr. 56.)  She had at least a high school education and was able to communicate in English.  (*Id.*)  She had past relevant work as a retail stock clerk and a data entry operator.  (*Id.*)

### B.   Medical Evidence

#### 1.   Medical Reports

In October 2007, Plaintiff began complaining of pain in her right hand, difficulty making a fist, and difficulty moving her fingers at times.  (Tr. 285.)  Her physician, Carmen Skinner, D.O., suspected carpal tunnel syndrome, and prescribed a splint and

2

Naprosyn.  (*Id.*)  An x-ray of Plaintiff's wrist was unremarkable.  (Tr. 287.)

Between March 2009 and July 2009, Plaintiff sought treatment at the emergency room for a left knee contusion (Tr. 290-293); an upper respiratory infection (Tr. 298); an animal bite (Tr. 302-305); abdominal pain, diarrhea, and vomiting (Tr. 306-313); and dental pain (Tr. 315-318).

In September 2009, Plaintiff began treating with Ghulam Idrees, M.D. (Tr. 320.) Plaintiff complained of stiffness and pain in both hands upon waking in the morning. (*Id.*)  She noted that the pain would last approximately two hours.  (*Id.*)  She also reported that it hurt to drive and that she could not grip things.  (*Id.*)  Dr. Idrees ordered testing for rheumatoid arthritis and lupus.  (*Id.*)  Results showed a negative rheumatoid factor, but a positive antinuclear antibodies (ANA) screen.  (Tr. 324-325.)

Plaintiff returned to Dr. Idrees in October 2009 and reported continued hand pain as well as pain in her right toes.  (Tr. 319.)  Dr. Idrees prescribed Prednisone for polyarthritis and suspected rheumatoid arthritis.  (*Id.*)  At Plaintiff's next visit with Dr. Idrees in December 2009, she reported that the Prednisone had helped, but that she was experiencing pain in her lower back, right knee, and elbows.  (Tr. 321.)  Plaintiff had mild swelling of her metacarpophalangeal (MCP) joints and decreased range of motion in her lumbar spine.  (*Id.*)

In February 2010, Arthur T. Armstrong, M.D., a rheumatologist, began treating Plaintiff based on a referral from Dr. Idrees.  (Tr. 334-335, 389.)  Plaintiff complained of pain and swelling in her hands and knees.  (Tr. 334.)  She also complained of weakness, weight loss, fatigue, and morning stiffness in her joints.  (*Id.*)  She stated

3

that Prednisone had helped, but that she had been off the medication for two weeks. (*Id.*)  On examination, Plaintiff exhibited mild tenderness in her proximal interphalangeal (PIP) and MCP joints, decreased grip strength, stiffness in all joints, and tenderness in her sacroiliac (SI) joint with radiation on straight leg raising.  (Tr. 335.)  Plaintiff had good range of motion of her joints, no active synovitis of her hands, no trigger points, and normal strength and reflexes.  (*Id.*)  Dr. Armstrong assessed Plaintiff with an elevated ANA, polyarthralgia, and sciatica.  (*Id.*)  He noted that Plaintiff had a lot of signs and symptoms that would be consistent with an autoimmune disease.  (*Id.*)  Dr. Armstrong prescribed Plaquenil for connective tissue disease and started Plaintiff back on Prednisone.  (Tr. 335, 370.)  He also recommended daily walking or light exercise. (Tr. 370.)

At a follow-up visit with Dr. Armstrong in March 2010, Plaintiff reported that her joint pain and energy were better with Plaquenil and that she had no morning stiffness. (Tr. 377.)  She rated her pain level at 1 on a scale of 1 to 10.  (Tr. 378.)  On examination, she had bilateral SI joint pain.  (*Id.*)  She exhibited no edema and her straight leg raising was normal.  (*Id.*)  She had normal joints, muscles, and range of motion with no swelling or tenderness.  (*Id.*)  Dr. Armstrong noted a possible diagnosis of undifferentiated connective tissue disease helped by Plaquenil.  (*Id.*)  He continued Plaintiff on Prednisone.  (*Id.*)

On April 22, 2010, Plaintiff told Dr. Armstrong that she had been having increased pain in her muscles and knees, particularly at night.  (Tr. 381.)  She reported having no morning stiffness.  (*Id.*)  Plaintiff stated that she was exercising two to three

4

times a week and that her pain level was at a three.  (*Id.*)  On examination, Plaintiff had

positive straight leg raising, SI pain, and left knee crepitus with scarring and

derangement due to prior trauma/surgeries on her knees.  (Tr. 334, 383.)  She had no

edema and had full motor strength, normal muscles, normal range of motion, no

swelling, and no tenderness of her joints.  (Tr. 383.)  Dr. Armstrong assessed Plaintiff

with arthralgias in multiple sites, backache with left-side sciatica, myalgia and myositis,

and fatigue.  (*Id.*)  He also noted his diagnosis of undifferentiated connective tissue

disease. (*Id.*)  Dr. Armstrong decreased Plaintiff's Plaquenil dosage due to her stomach

problems and continued her on Prednisone.  (Tr. 375, 383.)  He also recommended

daily walking or light exercise.  (*Id.*)

In May and June 2010, Dr. Idrees treated Plaintiff for cold symptoms, chest

pressure, and shortness of breath.  (Tr. 388, 393.)

In July 2010, Plaintiff told Dr. Armstrong that her back pain was better and that

she had no morning stiffness or localized swelling, but had increased left knee pain.

(Tr. 385.)  She reported that Neurontin helped her but made her too sleepy, stressed,

and fatigued, but that she was tolerating one Plaquenil daily.  (*Id.*)  On examination,

Plaintiff had left knee pain, SI joint pain, and positive straight leg raising.  (Tr. 386.)  She

had normal muscles and range of motion, no joint swelling, and tenderness in one joint.

(*Id.*)

In October 2010, Plaintiff complained of increased joint pain due to her

decreased dose of Plaquenil.  (Tr. 426.)  She reported to Dr. Armstrong that she had no

morning stiffness or localized joint swelling, and she exhibited normal strength and

range of motion and no swelling on examination.  (Tr. 427.)  She had left knee pain with crepitus and left SI joint pain.  (*Id.*)  Dr. Armstrong diagnosed Plaintiff with left knee arthropathy and mixed connective tissue disease helped by Plaquenil, but better with a higher dose.  (*Id.*)  Dr. Armstrong administered a corticosteroid injection to Plaintiff's left knee and increased Plaintiff's Plaquenil dosage.  (Tr. 428.)

At a follow-up visit with Dr. Armstrong in February 2011, Plaintiff reported low back pain and localized swelling in her fingers as well as hand stiffness.  (Tr. 429.)  Plaintiff stated that the knee injection she received in October had helped a lot but was wearing off, and that she was beginning to have more pain in her right knee.  (*Id.*)  She rated her pain level at 2.  (Tr. 430.)  On examination, Plaintiff had no hand pain or synovitis.  (*Id.*)  She had normal muscles and range of motion, and no swelling or edema.  (*Id.*)  She exhibited some lumbar pain and tenderness in two joints.  (*Id.*)  She also had bilateral knee pain and crepitus, but no effusions.  (*Id.*)  Dr. Armstrong noted that Plaintiff's undifferentiated connective tissue disease was stable on Plaquenil, but suggested transitioning to Nabumetone, an anti-inflammatory medication, and stopping all Prednisone.  (Tr. 421, 431.)  Dr. Armstrong also administered corticosteroid injections to both of Plaintiff's knees. (Tr. 431.)

In March 2011, Dr. Armstrong evaluated Plaintiff for medical clearance for gynecological surgery.  (Tr. 433.)  Plaintiff reported having arthralgias, but no muscle aches, no localized soft tissue swelling, and no muscle cramps.  (Tr. 434.)  She also told Dr. Armstrong that she had no neurological symptoms, no limb weakness, and no difficulty walking.  (*Id.*)  Plaintiff had a normal musculoskeletal examination, including

6

normal muscles, normal range of motion, normal joints, no swelling, and no joint tenderness.  (*Id.*)  Dr. Armstrong concluded that Plaintiff was medically appropriate for surgery.  (Tr. 435.)  He noted that Plaintiff's mixed connective tissue disease was stable on Plaquenil and that her arthralgias and backache were also stable.  (*Id.*)

On July 5, 2011, Plaintiff underwent a Functional Capacity Evaluation (FCE) by a physical therapist. (Tr. 473-476.)  Notes from the evaluation indicated that Plaintiff walked with an antalgic gait with decreased stance on her right lower extremity, and that she exhibited tenderness at the plantar surface of her right forefoot.  (Tr. 473.)  Plaintiff was unable to fully flex her fifth finger on her right hand to make a fist and had reduced range of motion in her second finger on the right, but she was able to use her first and third digits to manipulate pins in fine motor skills testing bilaterally.  (*Id.*)  Plaintiff also exhibited mildly decreased strength in her forearms, wrists, and fingers, but generally had normal strength in her lower extremities.  (Tr. 474-475.)  She could not use all of her fingers to grasp a box and exhibited a pain level of 10 out of 10 during the lifting testing, but she was able to lift 25 pounds and push and pull 15 pounds.  (Tr. 475.)  She was able to climb stairs in a reciprocal pattern using her arms for support.  (*Id.*)  The physical therapist summarized that Plaintiff displayed decreased ability to achieve a complete grasp and make a fist, which limited her lifting and pulling capacity, and that Plaintiff displayed decreased ambulation efficiency.  (*Id.*)  The physical therapist also noted that Plaintiff's activity was self-limited by pain.  (*Id.*)

Dr. Idrees reviewed the above FCE and, based on the evaluation and his own treatment, offered an opinion regarding Plaintiff's residual functional capacity (RFC).

(Tr. 471-472.)  Dr. Idrees opined that Plaintiff could stand for 34 minutes at one time, walk for four minutes at one time, and sit for 30 minutes at one time, although he indicated that Plaintiff's ability to sit "was tested but not to capacity: [patient] could sit longer."  (Tr. 471.)  He stated that Plaintiff could lift between 21 and 50 pounds occasionally[1] and that she could use her hands for repetitive pushing and pulling and for fine manipulation, but she could not use her hands for repetitive simple grasping.  (*Id.*)  He also opined that Plaintiff could use her feet for repetitive movements; occasionally bend, squat, and climb steps; and reach above shoulder level.  (Tr. 471-472.)  Dr. Idrees stated that Plaintiff had decreased grasp, decreased ambulation, and that pain was a limiting factor per Plaintiff's report.  (Tr. 472.)  He indicated that Plaintiff's condition was likely to deteriorate if placed under stress, particularly stress associated with a job.  (*Id.*)  On September 3, 2011, Dr. Idrees completed another physical capacity evaluation form, wherein he indicated that Plaintiff would likely have unscheduled absences from work occurring five or more days per month.  (Tr. 479.)

### 2.     Agency Reports

On April 3, 2010, W. Jerry McCloud, M.D., a state agency medical consultant, rendered an opinion regarding Plaintiff's RFC.  (Tr. 352.)  Dr. McCloud opined that Plaintiff could perform a range of light work[2] involving no climbing of ladders, ropes, or

---

[1]     "Occasionally" means "up to 1/3 of the time - up to 2.5 to 3 hours per day." (Tr. 471.)

[2]     Light work involves lifting no more than 20 pounds at a time, with frequent lifting or carrying of objects weighing up to 10 pounds, and generally involves "a good deal of walking or standing."  20 CFR §§ 404.1567(b), 416.967(b).

scaffolds, and occasional handling and fingering bilaterally because of decreased grip strength due to joint pain and swelling. (Tr. 352-359.)

On August 3, 2010, Willa Caldwell, M.D., a state agency medical consultant, reviewed Plaintiff's record and concluded that Plaintiff's statements regarding her limitations were not consistent with the evidence. (Tr. 409.) Dr. Caldwell affirmed Dr. McCloud's prior RFC opinion as written with the exception of his credibility finding. (*Id.*)

## C.    Hearing Testimony

### 1.    Plaintiff's Hearing Testimony

Plaintiff lived in a house with her husband and her seven-year-old daughter. (Tr. 73.) She testified that her most severe impairment was pain and discomfort in her hands. (Tr. 80.) She stated that the pain in her hands was constant and that it was worse in her right hand. (Tr. 81.) Her rheumatologist, Dr. Armstrong, told her that she was in the early stages of lupus. (*Id.*) Plaintiff also had pain in her lower back that came and went. (Tr. 86.) She experienced back pain when she stood or sat for too long. (*Id.*) Plaintiff also had pain in both knees and had three surgeries on her left knee. (Tr. 92.) She testified that she had pain in both of her feet and that her toes on her right foot had begun to curl, which doctors attributed to lupus affecting her joints. (Tr. 93.)

Plaintiff testified that she could not grip the handle of a gallon of milk but could pick it from the bottom, and that she could occasionally lift her daughter, who weighed 41 pounds. (Tr. 87-88.) Plaintiff could walk for about five or ten minutes without stopping and stand for 20-30 minutes. (Tr. 88.) She could sit for about 20-30 minutes

before needing to lie down or get up and move around. (Tr. 89.) She testified that she could not grip anything, including a steering wheel, and that she had to force herself to do some things–such as brushing her hair, getting dressed, and taking care of her daughter–without having to bend her fingers. (Tr. 75, 80, 82.) Plaintiff had a driver's license, but stated that she only drove to take her daughter to school and to go grocery shopping. (Tr. 74.) She drove using only the palms of her hands. (Tr. 75.) She testified that she taught herself how to hold things a certain way without having to bend her fingers. (Tr. 82.) She sometimes used a small cane to help her get around the house or do her grocery shopping. (Tr. 71.)

Plaintiff took different medications for her hand problems, including Plaquenil. (Tr. 83.) She experienced side effects from her medications including kidney infections, constipation, and tiredness. (Tr. 85.)

### 2.    Vocational Expert's Hearing Testimony

Betty Hale, a vocational expert, testified at Plaintiff's hearing. The ALJ asked the VE to assume a hypothetical individual with Plaintiff's vocational profile who would be limited to work at the light exertional level and would be unable to climb ladders, ropes, or scaffolds; could occasionally climb ramps and stairs; could occasionally stoop, kneel, crouch, and crawl; would be able to push and pull with her upper extremities up to 15 pounds; could occasionally finger bilaterally; would be able to frequently push and pull; and could operate foot pedals bilaterally. (Tr. 105.) The VE testified that the hypothetical individual could perform jobs such as a machine attendant, a ticket taker, and a parking lot attendant. (Tr. 106.)

The ALJ asked the VE to assume a second hypothetical individual with the same

10

limitations as the first hypothetical, but added that instead of occasional handling and fingering, the individual would be capable of frequent handling and fingering.  (Tr. 107.)  The VE testified that the individual would be capable of performing the jobs she previously named.  (*Id.*)

The VE testified that if an individual could not use her hands "at least on an occasional basis during the day," it would be work prohibitive.  (Tr. 110.)  Furthermore, the VE stated that if an individual is unable to use the digits of her hands "to even grasp a box," the person would be precluded from competitive employment.  (Tr. 109.)

## III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered disabled when she cannot perform "substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and* 416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate that she is not currently engaged in "substantial gainful activity" at the time she seeks

disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities." *Abbot*, 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    The claimant meets the insured status requirements of the Social Security Act through March 30, 2011.

2.    The claimant has not engaged in substantial gainful activity since May 30, 2008, the alleged onset date.

3.    The claimant has the following severe impairments: undifferentiated mixed connective tissue disease, sciatica, arthropathy of the left knee with internal derangement, status-post left knee surgery.

4.    The claimant does not have an impairment or combination of impairments that meets or medically equals the severity of one of the

listed impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.   After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never climb ladders, ropes, or scaffolds; can occasionally climb ramps and stairs; can occasionally stoop, kneel, crouch, and crawl; can push/pull up to 15 pounds; can frequently push/pull and operate foot pedals bilaterally; and can frequently handle and finger bilaterally.

6.   The claimant is unable to perform any past relevant work.

7.   The claimant was born in May 1985 and was 22-years-old, which is defined as a younger individual age 18-49, on the alleged disability onset date.

8.   The claimant has at least a high school education and is able to communicate in English.

9.   Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills.

10.  Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform.

11.  The claimant has not been under a disability, as defined in the Act, from May 30, 2008, through the date of this decision.

(Tr. 49-57.)

## LAW & ANALYSIS

### A.   Standard of Review

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of*

13

*Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

### B.     Plaintiff's Assignments of Error

#### 1.     The ALJ Erred in Basing His RFC Determination on an Unsupported Conclusion Contradictory to the Evidence of Record.

Plaintiff argues that the ALJ's RFC finding–specifically his conclusion that she was capable of frequent handling and fingering bilaterally–is not supported by substantial evidence.  According to Plaintiff, the ALJ's determination that Plaintiff's hand pain symptoms "waxed and waned" directly conflicted with a treating physician's opinion, two state agency consultative examiner opinions, and the evidence of record

14

as a whole.  Accordingly, Plaintiff contends that "[t]he ALJ's decision was unsupported by substantial evidence because there was not more than a scintilla of evidence . . . on which it was reasonable to conclude Ms. Toland's severe limitations from hand pain waxed and waned."  (Plaintiff's Brief ("Pl.'s Br.") 8.)  The Commissioner responds that the ALJ's conclusion with regard to Plaintiff's ability to handle and finger was based on an appropriate evaluation of the evidence and was amply supported by the record.

It is well established that an ALJ is not required to discuss each and every piece of evidence in the record for her decision to stand.  *See, e.g., Thacker v. Comm'r of Soc. Sec.*, 99 F. App'x 661, 665 (6th Cir. 2004).  However, where the opinion of a medical source contradicts her RFC finding, an ALJ must explain why she did not include its limitations in her determination of a claimant's RFC.  *See, e.g., Fleischer v. Astrue*, 774 F. Supp. 2d 875, 881 (N.D. Ohio 2011) (Lioi, J.) ("In rendering his RFC decision, the ALJ must give some indication of the evidence upon which he is relying, and he may not ignore evidence that does not support his decision, especially when that evidence, if accepted, would change his analysis.").  Social Security Ruling 96-8p provides, "[t]he RFC assessment must always consider and address medical source opinions.  If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted."  SSR 96-8p, 1996 WL 374184, *7 (July 2, 1996).

Here, several medical professionals rendered opinions related to Plaintiff's ability to use her hands:

- In April and August of 2010, State agency reviewers Dr. McCloud and Dr. Caldwell, respectively, opined that Plaintiff was limited to *occasional* fingering and handling bilaterally due to decreased grip strength.  (Tr.

15

355, 409.)

- On July 5, 2011, a physical therapist conducted a functional capacity evaluation and reported that Plaintiff "displays decreased ability to achieve a grasp and make a first which limits lifting and pulling capacity," and noted that Plaintiff was not able to use all of her digits to grasp a box.  (Tr. 475.)  The record reflects that Dr. Armstrong, Plaintiff's rheumatologist, electronically reviewed Plaintiff's FCE.  (Tr. 476.)

- Following Plaintiff's FCE in 2011, Plaintiff's treating physician, Dr. Idrees, opined that Plaintiff was capable of repetitive fine manipulation, but could not use her hands for repetitive simple grasping.  (Tr. 471.)

Based on a review of the evidence, including the aforementioned opinions of the state agency consultants, the physical therapist who conducted Plaintiff's FCE, and Plaintiff's treating physician, the ALJ concluded that Plaintiff can "frequently[3] handle and finger bilaterally."  In drawing this conclusion, he explained:  "The physical and subjective evidence that the claimant's hand symptoms wax and wane rather than being of a constant nature strongly discredit the claimant's testimony with regard to her functional limitations."  (Tr. 55.)  The ALJ then offered three reasons to support his conclusion that Plaintiff was capable of handling and fingering on a frequent basis: 1) evidence of improvement in her condition; 2) lack of any hand-related complaints for a year; and 3) her ability to modify tasks as needed using her unaffected fingers.  (*Id.*)  Finally, the ALJ individually addressed the opinions that conflicted with his finding regarding Plaintiff's ability to use her hands:

- **Drs. McCloud and Caldwell:** The ALJ gave "some weight" to the opinions of the state agency medical experts, noting that "subsequent evidence does not support the handling and finger limitations set forth in their assessments as the longitudinal efforts indicates her hand

---

[3]     "Frequently" means "between 1/3 and 2/3 of the time – from 2.5 or 3 hours to 5.5 hours per day."  (Tr. 471.)

16

symptoms tend to wax and wane, with long periods of stability in
between flares, as detailed above."  (Tr. 56.)

- **Physical Therapist:** The ALJ gave "some weight" to the opinion of
the physical therapist who administered Plaintiff's FCE.  (Tr. 56.)  He
indicated that the physical therapist's assessment of Plaintiff's fine
manipulation was consistent with the evidence from the evaluation,
but his limitation regarding grasping was "questionable as his report
indicates that the claimant self-limited her activities based on her
subjective reports of pain.  Further, he is not an acceptable source."
(*Id.*)

- **Dr. Idrees:** The ALJ gave Dr. Idrees' RFC opinion "little weight,"
noting that Dr. Idrees referred exclusively to the results of the FCE, in
which he did not participate.  (Tr. 56.)  The ALJ further explained that
the objective evidence showed an improvement and stability in
Plaintiff's condition on medication, and thus Dr. Idrees' opinion that
Plaintiff would miss five or more days of work per month was
unsupported.  (*Id.*)  Additionally, the ALJ noted that Dr. Idrees "has
played little role in treating the claimant's alleged disabling
impairments since she began treating with a rheumatologist
specializing in these conditions."  (*Id.*)

Thus, as required by the regulations, the ALJ acknowledged that his RFC assessment
conflicted with opinions from medical sources and explained why he did not adopt those
opinions.

In determining Plaintiff's RFC, the ALJ also discussed Plaintiff's longitudinal
history.  (Tr. 51-56.)  Plaintiff's medical records indicate that her hand problems were
worse at times and better at others.  For example, as Plaintiff admits in her Reply Brief,
"[t]he Defendant and the ALJ were correct in noting that Ms. Toland's records did not
reflect complaints of swelling in her hands from February 2010 until February 2011."
(Plaintiff's Reply ("Pl.'s Reply") 4.)  Between February 2010 and February 2011,
Plaintiff's records reflect some improvement in the pain symptoms related to her
connective tissue disease with Plaquenil and Prednisone.  (Tr. 377.)  Treatment notes

17

during the period between February 2010 and July 2011 show no edema or swelling, normal range of motion, and normal strength throughout. (Tr. 378, 382-383, 386, 427, 430, 434.) Although in February 2011 Plaintiff reported more hand stiffness and localized swelling to one or more finger joints, Plaintiff indicated that those symptoms occurred only in the morning. (Tr. 429.) Furthermore, at her March 2011 examination with Dr. Armstrong, Plaintiff had no muscle aches or cramps and had full strength, normal muscles, normal range of motion, and no joint swelling or tenderness. (Tr. 434.) Based on this and other evidence, the ALJ concluded:

> The claimant . . . exhibited decreased grip on the right only at her February 2010 examination and at her July 2011 functional capacity evaluation. Notes during this approximately 18-month interim period show no edema or swelling, normal range of motion, and normal strength throughout. Indeed, her rheumatologist described her condition as stable. The physical evidence thus indicates waxing and waning of the claimant's condition, with a significant period of stability in between.

(Tr. 54.)

While the ALJ provided a detailed justification for his conclusion that Plaintiff could frequently handle and finger bilaterally, his assessment of Plaintiff's hand limitations is nonetheless difficult to review for two major reasons: 1) the ALJ was not clear in what he meant by "waxing and waning" of Plaintiff's hand symptoms; and 2) the ALJ did not make a finding regarding Plaintiff's ability to grasp, but instead grouped fingering, fine manipulation, handling, and grasping into one analysis. For the following reasons, Plaintiff's case should be remanded to the ALJ for a more detailed explanation and further consideration of Plaintiff's hand limitations.

The ALJ concluded that Plaintiff's hand symptoms "waxed and waned," with a significant period of stability in between. (Tr. 54, 55.) The ALJ did not, however,

18

provide a clear explanation for what he meant by waxing and waning.  In his decision, the ALJ noted that Plaintiff went a period of 18 months with "no edema or swelling, normal range of motion, and normal strength throughout."  (Tr. 54.)  This seems to suggest that by finding that Plaintiff's hand symptoms wax and wane, the ALJ meant that Plaintiff's symptoms did not last for a continuous period of not less than 12 months.  In the next paragraph of his decision, however, the ALJ noted that when Plaintiff's hand complaints returned in February 2011, "she indicated these symptoms occurred only in the morning.  Her reports thus also support waxing and waning of her symptoms, and indicate her symptoms are not constant throughout the day even when she experiences a flare."  (*Id.*)  There, it appears that by "waxing and waning," the ALJ meant that Plaintiff's hand symptoms were not continuous throughout the day or did not appear every day.  The ALJ did not make or articulate a finding as to the intensity, persistency, and frequency of Plaintiff's handling, fingering, and grasping limitation.  Without more explanation, the Court cannot fully review the ALJ's opinion that Plaintiff could use her hands–whether it be for handling, fingering, manipulating, or grasping–frequently (from 2.5 or 3 hours to 5.5 hours per day) and on a continual and regular basis in her employment.[4]

While it is true that Plaintiff's longitudinal history reflects some temporary symptom stability, this does not equate to a complete improvement in her hand

---

[4]     As an example, it is not clear whether Plaintiff's hand symptoms occurred at all times of the day for one month straight and then did not reoccur until months later, whether Plaintiff's hand symptoms were present every day for several months but only for a brief period of the day, or with some other frequency or duration.

limitations. Even between February 2010 and February 2011, when Plaintiff did not complain to her physicians about swelling in her hands or an inability to grip, the treatment notes from this period still indicate continued joint pains and arthralgias. (Tr. 377, 379, 383, 385-386.) At Plaintiff's FCE in July 2011, she displayed "decreased ability to achieve a grasp and make a first." (Tr. 475.) Plaintiff's treating physician Dr. Idrees opined shortly thereafter that while Plaintiff is capable of fine manipulation and pushing and pulling, she could not use her hands for repetitive simple grasping. (Tr. 471.) At her administrative hearing, Plaintiff testified that she could not grip things and had to teach herself how to hold things a certain way without having to bend her fingers. (Tr. 75, 82.) Thus, substantial evidence supports a conclusion that although Plaintiff's hand symptoms may have been better at times and worse at others, her symptoms have not resolved, and she still experiences some degree of limitation in her hands. Given the ALJ's use of the undefined phrase "waxing and waning" to discredit the evidence supporting Plaintiff's hand limitations, the ALJ's decision is particularly difficult to review.

Moreover, the ALJ's decision is not capable of meaningful review, because the ALJ did not make a finding regarding Plaintiff's ability to grasp, but instead conflated fingering, fine manipulation, handling, and grasping into one analysis when in fact they are discrete functions in this case. First, contrary to Plaintiff's assertion, substantial evidence is available to support the ALJ's finding that Plaintiff is capable of frequent *fingering*. The physical therapist who conducted Plaintiff's FCE found that Plaintiff could use her first and third digits to manipulate pins in fine motor skills testing, and Plaintiff's treating physician, Dr. Idrees, opined that Plaintiff could use her hands for

repetitive fine manipulation.  (Tr.  471, 473.)  While state agency medical experts Drs. McCloud and Caldwell limited Plaintiff to occasional fingering, they rendered their opinions in 2010, almost a year after the FCE and the RFC opinion from Dr. Idrees, and thus did not have all of the relevant evidence available to them when forming their opinions.  (Tr. 355, 409.)  Accordingly, substantial evidence exists to support the ALJ's determination that Plaintiff was capable of frequent fingering.[5]

While the ALJ accounts for Plaintiff's limitations with regard to fingering by limiting her to frequent fingering bilaterally, he does not indicate in his RFC determination whether Plaintiff is capable of grasping and, if so, to what frequency she is able to grasp.   At Plaintiff's hearing, the ALJ asked the VE "if someone is unable to use the digits of their hands to even grasp a box, would such limitations at the light exertional level in your opinion eliminate competitive employment," and the ALJ responded that it would.  (Tr. 108-109.)  Accordingly, the ALJ's failure to make a finding regarding Plaintiff's ability to grasp is not harmless.

While evidence exists to support a finding that Plaintiff is limited in her ability to grasp, the ALJ did not include a limitation as to grasping in Plaintiff's RFC or fully

---

[5]     Additionally, Plaintiff has not explained how the ALJ's limitation of Plaintiff to frequent rather than occasional fingering would change the outcome of her case, as the VE testified that a hypothetical individual limited to work at the light exertional level who could only occasionally finger bilaterally would be capable of jobs existing in significant numbers in the national economy.  (Tr. 105.)  The VE later testified that if an individual could not use her hands "at least on an occasional basis during the day" it would be work prohibitive.  (Tr. 110.)  It is not clear from the record, however, what the VE meant by "occasional" and whether he was using the term colloquially or as defined in the regulations.  Furthermore, Plaintiff has introduced no evidence indicating that she has no use of her hands whatsoever, even on an "occasional" basis.

explain reasons for discounting it.  The ALJ acknowledges that the physical therapist who conducted the FCE noted that Plaintiff displayed a decreased ability to achieve a complete grasp and make a fist, but notes that the physical therapist's findings are "questionable as his report indicates that the claimant self-limited her activities based on her subjective reports of pain."  (Tr. 56.)  The ALJ purports to believe that the physical therapist's note that Plaintiff was "self-limited by pain" meant that Plaintiff was malingering for secondary gain, rendering the FCE findings unreliable.  The physical therapist did not note that Plaintiff feigned pain during the FCE, however, and did not indicate whether Plaintiff's "activity" that was self-limited by her pain even related to the use of her upper extremities.[6]  (Tr. 475.)  Therefore, the ALJ's conclusion that the physical therapist's findings regarding Plaintiff's ability to grasp were "questionable" due to the fact that Plaintiff was self-limited by pain is unpersuasive.

The ALJ also found that "the results of the functional capacity evaluation indicate the claimant retains significant use of her hands," because Plaintiff was able to complete fine motor coordination testing by using non-affected fingers, and she was able to pick up a box even though she could not use all of her fingers in doing so.  (Tr. 55.)  Again, the ALJ conflates fingering and grasping.  At the FCE, Plaintiff was able to use her first and third digits to manipulate pins in fine motor skills testing.  (Tr. 474.)  She was not, however, able to grasp a box.  (Tr. 475.)  Plaintiff testified at her hearing that her most limiting impairment was pain and discomfort in her hands and that she

---

[6]     Notes from the FCE indicate that Plaintiff had an antalgic gait and displayed decreased ambulation and a pain level of 9-10 out of 10 in her right foot and 5-6 out of 10 in her left knee.  (Tr. 475.)

22

could not grip anything, including the handle of a gallon of milk, a pen, or a steering wheel. (Tr. 75, 80, 82.) That Plaintiff found other ways to operate a steering wheel and lift objects without using her fingers to grasp does not undermine her claim that she was limited in her ability to grasp.

Given the opinions from the physical therapist who conducted Plaintiff's FCE and Plaintiff's treating physician supporting Plaintiff's inability to grasp, as well as Plaintiff's own testimony regarding her hand limitations, the ALJ should have made a clear finding as to grasping when determining Plaintiff's RFC. While substantial evidence supports the ALJ's conclusion that, despite opinion evidence from the state agency experts, Plaintiff could finger frequently rather than occasionally, the ALJ has not indicated whether and to what extent Plaintiff is able to grasp.

Due to the ALJ's lack of a finding regarding Plaintiff's ability to grasp; his grouping of fingering, fine manipulation, handling, and grasping into one analysis; and his use of the undefined phrase "waxing and waning" to discredit the evidence supporting Plaintiff's hand limitations, the ALJ's decision is not capable of meaningful review. Accordingly, Plaintiff's case should be remanded to the ALJ for a more careful explanation of Plaintiff's hand limitations.

## 2. The ALJ Erred in Evaluating the Opinion of Plaintiff's Treating Physician.

Plaintiff argues that the ALJ erred in evaluating the RFC opinion of Plaintiff's treating physician, Dr. Idrees. "An ALJ must give the opinion of a treating source controlling weight if he finds the opinion 'well-supported by medically acceptable clinical and laboratory diagnostic techniques' and 'not inconsistent with the other substantial

evidence in the case record.'" *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004) (quoting 20 C.F.R. § 404.1527(d)(2)) (internal quotes omitted). If an ALJ decides to give a treating source's opinion less than controlling weight, he must give "good reasons" for doing so that are sufficiently specific to make clear to any subsequent reviewers the weight given to the treating physician's opinion and the reasons for that weight. *See Wilson*, 378 F.3d at 544 (quoting S.S.R. 96-2p, 1996 WL 374188, at *5 (S.S.A.)). This "clear elaboration requirement" is "imposed explicitly by the regulations," *Bowie v. Comm'r of Soc. Sec.*, 539 F.3d 395, 400 (6th Cir. 2008), and its purpose is to "let claimants understand the disposition of their cases" and to allow for "meaningful review" of the ALJ's decision, *Wilson,* 378 F.3d at 544 (internal quotation marks omitted). Where an ALJ fails to explain his reasons for assigning a treating physician's opinion less than controlling weight, the error is not harmless and the appropriate remedy is remand. *Id.*

In light of the aforementioned discussion of Plaintiff's first assignment of error, this Court is not in a position to review the ALJ's treatment of Dr. Idrees' opinion regarding Plaintiff's residual functional capacity. Because Dr. Idrees opined that Plaintiff was not capable of using her hands for repetitive simple grasping, and the VE testified that there would be no jobs available for an individual who was "unable to use the digits of their hands to even grasp a box" (Tr. 108-109), it is necessary for the ALJ to fully explain Plaintiff's hand limitations–including grasping–before determining the weight to give to Dr. Idrees' opinion that Plaintiff cannot grasp. Accordingly, on remand, the ALJ shall reevaluate Dr. Idrees' RFC opinion after providing a more careful explanation of Plaintiff's hand limitations and a specific finding regarding Plaintiff's ability to grasp.

## VI.    CONCLUSION

For the foregoing reasons, the Magistrate Judge recommends that the

Commissioner's final decision be REVERSED and REMANDED for proceedings

consistent with this Report and Recommendation.


s/ *Nancy A. Vecchiarelli*
U.S. Magistrate Judge

Date: April 28, 2014

## OBJECTIONS

**Any objections to this Report and Recommendation must be filed with the Clerk of Court within fourteen (14) days after the party objecting has been served with a copy of this Report and Recommendation.  28 U.S.C. § 636(b)(1). Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985), *reh'g denied*, 474 U.S. 1111 (1986).**